Argued April 30; affirmed May 11, 1943

SCHWARZENBACH *v.* MILLER et al.

(137 P. (2d) 283)

Before BAILEY, Chief Justice, and BELT, ROSSMAN, KELLY, LUSK, BRAND and HAY, Associate Justices.

*Will H. Masters,* of Portland, for appellant.

*Jesse G. Warrington,* of Portland, for respondents.

KELLY, J.  Two of the mortgages in suit were executed by defendant, M. Miller, daughter of defendants, Solomon Miller and Violet Miller, in one of which W. H. Wells and Kate M. Wells were the mortgagees, and in the other Charles L. Dick, Edward C. Dick, Paul S. Dick and Pearl D. McCord were the

mortgagees; one of the four mortgages was executed by Matthew Padrov and Lea Padrov, wherein Roscoe R. Morrill was the mortgagee; and one of the mortgages was forged, purporting to have been executed by M. Miller and naming Lutke Holding Company as mortgagee. Each mortgage was upon a piece or parcel of real property separate and distinct from that which was described in the other three mortgages.

For brevity, these mortgages are termed respectively the Dick mortgage, covering property at Southeast 26th Avenue and Clinton street; the Wells mortgage, covering property at 13th and Montgomery street; the Padrov mortgage, covering property at Southeast 60th Avenue and Holgate street and the Lutke mortgage, purporting to cover property in Myrtle Park, all in the city of Portland, state of Oregon.

The property covered by the Dick mortgage and the Wells mortgage was held in the name of M. Miller and the mortgages thereon were purchase money mortgages. The property covered by the Padrov mortgage was purchased by defendant Solomon Miller subject to such mortgage.

The Lutke mortgage and the note which it purported to secure was forged. In the Circuit Court of the State of Oregon for Multnomah County in a suit instituted by Mendella Miller, heretofore referred to as M. Miller, through her guardian ad litem, Violet Miller, against Solomon Miller, alias A. G. Sheftel, Mrs. E. Champlin, and Zelma, Inc., a corporation, wherein Lena Elenbogen intervened, such proceedings were had that on the 11th day of January, 1941, a decree was duly rendered to the effect that defendant, Solomon Miller, was the sole and exclusive, equitable and beneficial owner of the real property involved in

the instant suit and other real property, and that said Mendella Miller, plaintiff therein, and defendant herein, held the legal title thereto in trust for said defendant, Solomon Miller.

In said suit said decree further declared that a certain judgment in favor of said intervener, Lena Elenbogen, against said defendant, Solomon Miller, entered by said Circuit Court of the State of Oregon for Multnomah County on the 30th day of November, 1939, for the sum of $10,000, together with the costs and disbursements of plaintiff therein taxed in the sum of $61.10, appearing of record in the judgment docket of the County of Multnomah, State of Oregon, book 35, page 160, together with additional accrued costs and accrued interest was a first and valid subsisting lien in, to and upon said real property in suit and other real property and the whole thereof, held in trust by Mendella Miller for the use and benefit of Solomon Miller as thereinbefore set forth. By the terms of said decree said lien of Lena Elenbogen upon said real property was foreclosed and the sale of said real property was ordered as by law upon execution.

On the 7th day of April, 1941, said real property was sold to said Lena Elenbogen and Jesse G. Warrington by the sheriff of Multnomah county upon execution duly issued upon said judgment in favor of said Lena Elenbogen; and on the 18th day of July, 1941, said sale was duly confirmed. The instant suit was instituted upon the day of said sale upon execution, namely, April 7, 1941.

Thus it will be seen that the issue herein is between plaintiff and her assignors on one side and defendants Lena Elenbogen and Jesse G. Warrington on the other, and the question is whether the mortgages in

suit are valid liens on the respective parcels of real property described therein.

At all times mentioned herein, plaintiff, Louise Schwarzenbach, was the wife of Otto Schwarzenbach, and plaintiff and her said husband were the parents of May Schwarzenbach.

It is contended by defendants, Elenbogen and Warrington, that in point of fact, the mortgages were paid by defendant, Solomon Miller, and that the purported assignments were executed to defraud them, the said Elenbogen and Warrington and other creditors of Miller. As to the Lutke mortgage, defendants Elenbogen and Warrington contend also that it is invalid because it was forged.

The assignment of the Dick mortgage was executed on June 20, 1939; of the Wells mortgage on June 13, 1939, and of the Padrov mortgage on July 6, 1939. These three assignments by the mortgagees were filed for record on December 18, 1939. The Dick and Padrov mortgages were assigned by the respective mortgagees to plaintiff. The Wells mortgage was assigned by the mortgagee to Mr. Schwarzenbach and the Lutke mortgage purported to be assigned by the corporation named therein as mortgagee to the Lutke Estate Company, and by that company to M. Schwarzenbach. Mr. Schwarzenbach and May Schwarzenbach assigned the Wells and Lutke mortgages respectively to plaintiff for collection.

On December 4, 1939, an execution upon the aforesaid judgment of Lena Elenbogen against Solomon Miller was issued commanding the arrest and commitment to jail of said Solomon Miller, and said Solomon Miller was thereupon incarcerated in the Multnomah County jail until the 18th day of December, 1939, at which time said Solomon Miller made and filed a

pauper's oath whereupon Honorable Louis P. Hewitt, judge of the circuit court, who presided over the trial of the case of *Lena Elenbogen v. Solomon Miller,* made an order discharging said Solomon Miller from imprisonment. It will be noted that the purported assignments last mentioned were filed for record upon the same day that Solomon Miller was released from jail.

Upon appeal, plaintiff's attorney argued that too much consideration had been given by the trial court to the character and conduct of Solomon Miller and that the fact was overlooked or undervalued that at the time of the assignments by the mortgagees to plaintiff and her assignors, the mortgages in suit were valid mortgages and the respective mortgagees were free from any suspicion of fraud. We find nothing in the record which supports that criticism. The Wells mortgage and the Dick mortgage were executed by Solomon Miller's daughter while she was merely the trustee for Miller and evidently Miller had brought that relationship about to hinder and defraud his creditors. No suspicion attaches in any respect to the mortgagees named therein. As stated, the Lutke mortgage was a forgery. The Padrov mortgage was free from any suspicion of fraud.

The trial court was compelled to consider the character and conduct of Solomon Miller and likewise this court is compelled to do so, because Solomon Miller was the dominant figure and controlling agent in negotiating and consummating the assignments to plaintiff, her husband and their daughter, of the mortgages in suit.

The following is an excerpt from the cross-examination of plaintiff:

"Q (By Mr. Warrington) Now Mrs. Schwarzenbach, how did it happen that you became inter-

ested in the purchase of this Wells mortgage in June of 1939?

A Well, I - - -

Mr. Masters: (Interrupting) Speak up. Can't you speak up?

A When we insisted on buying some mortgages - - -

Mr. Warrington: (Interrupting) I am talking about you, please, Mrs. Schwarzenbach.

A I am answering it. Miller told me about it, so I wanted to buy it. I asked him about it.

Q What?

A I asked Miller about a mortgage, if he knew about these mortgages, and he said it was all right, and so I just said, 'I will buy it'.

\* \* \* \* \*

Q And how did you learn about the Wells mortgage first?

A Miller told us about it. He knew about it.

Q Miller gave you the first information of the existence of this Wells mortgage? Is that right?

A Yes, I believe so as near as I remember.

Q Well, do you think of anyone else who could have given you that information? A No.

Q It came from Solomon Miller, did it?

A I think so. I am not sure. I guess so.''

We also quote from plaintiff's cross-examination about the Padrov mortgage and its assignment:

''Q And where was this assignment of mortgage first delivered to you?

A Oh, in the drug store when I went to get it there.

Q After you decided to buy this mortgage, what did you do in the way of actually purchasing it?

A I paid for it.

Q Well, who did you see and how did you pay? Who did you see about the property or the mortgage?

A Well, I had Miller see Mr. Morrill about it.

Q Oh, you had Miller buy it for you?
A Yes, he was a friend of Morrill's, and had known each other for years.

\* \* \* \* \*

Q \* \* You didn't see Mr. Morrill in connection with the purchase of this mortgage at all then?
A No, we just delivered the money.

\* \* \* \* \*

Q To be delivered to Mr. Morrill?
A Yes, we wrote out a check and left it at the drug store to be delivered to Mr. Morrill.''

The following is an excerpt from the testimony of Mr. Morrill:

''Q Well, just tell us briefly how Mr. Miller was involved in the Padrov mortgage, how he became involved in it.
A I understand that Mr. Miller bought the property that was secured by the mortgage and took the title subject to the mortgage.
Q Subject to the mortgage. Then thereafter who paid the interest on the mortgage?
A After Mr. Miller took the title, Mr. Miller paid the interest up to 1939.
Q Just roughly, when did Mr. Miller take the title?
A About '30 or 31.
Q Then what was the condition of that loan in the summer of 1939?
A Well, of course it was way overdue and it was approaching the time when the statute of limitations would have bothered, and I was insisting on payment.
Q To whom were you insisting on payment?
A Insisting to Sol Miller.
Q And what happened in that connection after you had insisted upon payment?
A Finally Mr. Miller, after I had been insisting for two or three months—I was getting ready to foreclose—Mr. Miller called me on the phone

and told me if I would bring the note and mortgage and the insurance policy that went with it up to the office he would give me the money.

Q Where was his office?

A In the drugstore of the Portland Hotel Building.

Q Portland Hotel Pharmacy?

A Yes.

Q All right, what did you do then, Mr. Morrill?

A I took the papers up there with a satisfaction of the mortgage and showed them to Mr. Miller. He said, 'Oh this isn't what I want.' He said: 'I want an assignment.' He said: 'I want to turn this over. Another party is paying off this mortgage. I want an assignment turning the mortgage over to them.'

Q What is the fact as to whether or not that was the first you had heard of an assignment?

A That was the first I had heard of an assignment, right then.

Q Then, what transpired while you were there at that time?

A Well, I saw the check that he was going to pay me with and it was a name that I wasn't familiar with at all; I didn't know the parties and it wasn't certified or anything, and I told him, I says, 'Sol, if you are going to pay me with this check you will have to have it certified by the bank.' It was drawn on the United States National Bank. He says, 'Well, I can attend to that.' I went back to my office then and made out an assignment of the mortgage. He gave me the name to make it to. The name that I recollect that I had was L. Schwarzenbach. That I think was the name on the check. I don't think it was Louise: I think it was L. I went back to the office and made out an assignment to L. Schwarzenbach and brought it up to the drugstore, and that was satisfactory. In the meantime he had gotten the check certified by

the United States National Bank and I turned the assignment over to them - - - or to Mr. Miller and he gave me the check.

Q Was any conversation had as to the identity of the party to whom the assignment was to be given.

A Oh, I asked who it was but I didn't go into that at all. It wasn't anybody that I knew or had ever heard of, but he got the check certified by the bank.

Q Did you at that time meet anybody who was identified to you as being the purchaser of this mortgage.

A I did not.''

On cross-examination of Mr. Morrill, the following questions among others were asked and answered as follows:

''Q As I understand you, Mr. Morrill, you thought that Miller was paying the mortgage off and wanted a satisfaction?

A Yes.

Q And when you got up there you found that somebody else was paying the mortgage off and he wanted an assignment, as I understand it, and so you made the assignment?

A Yes.''

As to the assignment of the Dick mortgage, Mr. Schwarzenbach testified that at Mr. Miller's instance, he had loaned $2,500 to a corporation named Zelma. This corporation had been declared by the circuit court to be merely the holder of property actually owned by Miller, and that thereafter Mr. Schwarzenbach insisted that Solomon Miller donate his time to arrange for the purchase by Schwarzenbach of the Dick mortgage because he, Schwarzenbach, had a job and couldn't waste his employer's time too much.

Plaintiff's testimony and that of her husband pictures an attitude of Mr. Schwarzenbach toward banks that impelled him to maintain a safety deposit box in which to keep his money for fear the bank, in which he might deposit it, would fail. Mr. Schwarzenbach, however, was not told by Miller when Schwarzenbach was importuned by Miller to loan the Zelma corporation $2,500 that the real property held by the Zelma corporation was encumbered by the four purchase money mortgages upon it. Miller then mentioned only the $23,000 mortgage upon the property at Third and Burnside streets and the $7,000 mortgage upon the property at 65th and Foster Road. It was not until a trial was had involving those holdings that Schwarzenbach became aware that the Zelma corporation had executed these four purchase money mortgages. When Schwarzenbach thus found that to be the fact, apparently he did not experience any distrust of Miller and his methods notwithstanding the adverse effect thereof upon his investment of $2,500, for it was but a short time thereafter that he asked Miller to secure the assignment of the Dick mortgage and at about the same time Mrs. Schwarzenbach, with Schwarzenbach's knowledge and consent, secured Mr. Miller's services in procuring for her the assignments of the Padrov and Wells mortgages. This attitude of distrust of banks and the implicit faith in and reliance upon Miller are not consistent.

Mr. Schwarzenbach was asked whether he talked to anybody else except Solomon Miller about this Dick mortgage and the purchase of it and he answered in the negative.

He then testified that at the instance of Mr. Miller he saw Mr. Meyers at the bank and Mr. Meyers handed him some papers which constituted the receipt for the

money that he paid for the assignment of the mortgage. When asked how he knew where to find Mr. Meyers, Mr. Schwarzenbach testified that Solomon Miller told him. Mr. Schwarzenbach was asked whether Sol Miller had made all the preliminary arrangements for the purchase of this mortgage, and he answered, "Yes, I asked him to."

During the course of the trial in the circuit court while Mrs. Schwarzenbach was on the witness stand, at the request of counsel, the witnesses were excluded from the courtroom. Thereafter, the bailiff Mr. Gloss, at the request of Mr. Warrington, made the following statement to the court:

"While this lady (referring to Mrs. Schwarzenbach) was testifying here her husband was giving her high signs, and I warned him once and he went at it again, and so I told Mr. Warrington."

This statement was not contradicted or explained.

As to the Lutke mortgage, while unquestionably it is a forged instrument, we feel justified in stating how it came to be assigned to Miss May Schwarzenbach. We quote from her testimony:

"Q  How did you happen to purchase that mortgage?
 A  Mr. Miller came to our house and said there was a chance to buy a $400.00 for $310.00. * * * And he said if I would like to buy it, why I could, and so I gave my father the money and he made out a check and gave it to Mr. Miller to take to the Lutke Company."

When asked if she had ever demanded any payment of the note or any part of it from Sol Miller, she said, "No I didn't".

It appears from Miss Schwarzenbach's testimony that she knew nothing of the transfer to her of Mr.

Miller's home property until she learned of it in the trial of the case wherein Miss Mendella Miller, by her guardian ad litem, was plaintiff and Solomon Miller and others were defendants and Mrs. Elenbogen was an intervener.

Miss Schwarzenbach testified that she became acquainted with Mr. Solomon Miller sometime during 1938.

It appears that in 1935 Solomon Miller was convicted of involuntary manslaughter and served a term of imprisonment in the penitentiary. On March 13, 1939, the intervener therein Mrs. Elenbogen instituted an action charging libel against him, which, as stated above, on November 30, 1939, resulted in a judgment against him in the sum of $10,000 and the further sum of $61.10, costs and disbursements. As above stated, in order to secure his release from imprisonment in the county jail pursuant to an execution on said judgment, an affidavit was made by Miller to the effect that he had no property not exempt from execution of value in excess of $20. Thereafter, that affidavit was made the basis of an indictment charging Miller with perjury to which Miller pleaded guilty and was sentenced to imprisonment in the penitentiary for a term not to exceed three years.

On November 13, 1937, Credit Service Company instituted an action in the Circuit Court of the State of Oregon for Multnomah County, against Solomon Miller and Jack Allen doing business as Empire Drug Company. On September 10, 1940, in said last named action an order was made dismissing said action as to Jack Allen and a judgment was rendered against Solomon Miller in the sum of $1,894.17 with interest thereon at the rate of six per cent per annum from the 20th day of

October, 1937. On said September 10, 1940, execution issued on said judgment. On September 11, 1940, return on said execution was made by the sheriff of Multnomah County to the effect that $393.65 had been realized upon the sale of attached property and that said writ of execution was satisfied in part only in the sum of $393.65.

On December 3, 1937, an action was instituted in said circuit court by Credit Service Company against Solomon Miller and Jack Allen doing business as Empire Drug Company; and on the 18th day of April, 1938, an order of dismissal as to Jack Allen was entered and a judgment was rendered against Solomon Miller in the following sums and amounts; said respective sums bearing interest from the following named dates respectively at the rate of six per cent per annum, to wit:

$124.24, with interest from November 12, 1937; $101.32, with interest from November 12, 1937; $63.92, with interest from October 31, 1937; $57.20, with interest from September 29, 1937; $51.30, with interest from October 6, 1937; $32.72, with interest from October 21, 1937; $22.90, with interest from November 1, 1937; $20.39, with interest from October 26, 1937; $11.97, with interest from October 23, 1937; $8.23, with interest from November 8, 1937; and for its costs and disbursements.

It will thus be seen that when the assignment of the mortgages in suit were procured, Mr. Miller was being sued by his creditors. Notwithstanding their disclaimers, we think that both plaintiff and her husband were aware of Mr. Miller's embarrassment in that regard.

In a suit instituted in said circuit court on November 7, 1938, by Violet Miller against Solomon Miller, alias

A. G. Sheftel, Mrs. E. Champlin and Nova, Inc., a corporation, Mr. Schwarzenbach acted as receiver of the Portland Hotel Pharmacy from January 26, 1940, to July 11, 1940.

On January 6, 1940, Mr. Schwarzenbach verified an answer in behalf of the therein named defendant Nova, Inc., which was filed in said last named suit on the 10th day of January, 1940.

On July 11, 1940, Mr. Schwarzenbach was removed as such receiver and Mr. Dean Bryson was appointed; but rental of property, which should have been paid to Mr. Bryson, as such receiver, was collected by Mr. Schwarzenbach.

After the trial of the case had been closed, the trial judge addressed a letter to counsel for both parties. This letter is known to the record as exhibit 69. The part thereof which is pertinent to the issue herein is as follows:

"I have decided to ask counsel for additional argument on a point not argued to me.

Savings account books are in evidence showing Otto Schwarzenbach's account from September, 1929 to July, 1939. His book showing deposits to his checking account in the U. S. Bank is in evidence from September, 1935, to May, 1941. Mae Schwarzenbach's savings account book is in evidence for the years 1935 to 1939. Louise Schwarzenbach's savings book is in evidence but does not appear important in the present connection. A check drawn by Otto Schwarzenbach on The First National Bank is in evidence indicating a checking account in that bank, of which there is no other evidence.

Otto Schwarzenbach's savings and banking habits were such that he customarily deposited to both his savings and his checking accounts small amounts three or four times per month. These amounts were in even dollars, such as $10, $15, $20,

$25, $30 and so on up to $50, although the deposits above $30 and $35 were infrequent. These smaller deposits continued during nearly all of the times under examination.

However, during the times in which the other evidence shows associations between the Schwarzenbachs and Mr. Miller there are a number of additional deposits, distinguished from the smaller deposits above mentioned by reason of the fact that they were larger and were in irregular amounts of odd dollars and cents.

I have found it of interest to segregate and add up these two classes of deposits to Otto Schwarzenbach's savings and checking accounts in the U. S. Bank, making the segregation according to my own judgment. This work produces a schedule as follows:

| | | Savings | Checking |
|---|---|---|---|
| 1936 | Small | $ 387.00 | $ 467.00 |
| | Large | ------------ | 200.00 |
| | Total | | 667.00 |
| 1937 | Small | 310.00 | 450.00 |
| | Large | 250.00 | 2,169.00 |
| | Total | 560.00 | 2,619.00 |
| 1938 | Small | 650.00 | 495.00 |
| | Large | ------------ | ------------ |
| 1939 | Small (to July 1939) | 495.00 | 320.00 |
| | Large | | 2,710.00 |
| | Dick and Wells | | 3,400 |
| | Total | 495.00 | 6,430.00 |
| 1940 | Small | | 650.00 |
| | Large | | 7,142.92 |
| | Total | | 7,792.92 |
| 1941 | Small | ------------ | 60.00 |
| (to 5/10) | Large | ------------ | 5,516.75 |
| | Total | | 5,576.75 |

The deposits to Mae Schwarzenbach's savings account for several years are as follows: 1935, $5.02; 1936, $139.22; 1937, $259.95; 1938, $130.00; 1939, $375.00; 1940, $950.00.

It is arguable that the larger deposits represent money belonging to Solomon Miller. A bundle of checks in evidence shows the disposition of some $3,900 of this money, but there is no showing as to what Mr. Schwarzenbach did with the balance.

I have not had the benefit of the arguments of counsel as to the inferences which should properly be drawn from these figures or the proper relation of this testimony to the balance of the record, and am loathe to write an opinion discussing these matters before being thus advised. Therefore, I request counsel to give me the benefit of their views. This can be done orally or in writing or by both means, as counsel may decide.''

Upon reexamination of Mr. Schwarzenbach, it was developed that, while acting as receiver of the Portland Hotel Pharmacy, he installed a soda fountain which he operated as a distinct enterprise from the general business of the pharmacy. He made no report to the court of the business transacted at the soda fountain.

Exhibit 70 was received in evidence while Mr. Scharzenbach was testifying on his reexamination. It consists of a number of checks. The trial judge summarized the relevant portion of this exhibit thus:

"The Court: Now you have gone through that bundle of checks, marked Exhibit 70 and picked out that one, two, three checks of $375.00 each to Morris, Beggs & Simpson on the 3rd and Burnside property. Let us multiply that and see what we get. That is $1,125.00, and you picked out of that bunch of checks several checks to the Prudential Insurance on the 65th and Foster property, $110.00, plus $60.00, plus $110.00, making a total of $280.00, and you paid Mr.

Masters several checks, running from $25.00 to $100.00, perhaps a rough estimate of between $200.00 and $250.00, and you paid Mr. Person fifty or seventy-five dollars, and these are the total of the checks in Exhibit 70 relating to the Zelma or Nova corporation; is that substantially correct?

A Yes, sir.''

\* \* \* \* \*

''Q So if you took the total of all these checks in Exhibit 70, and deducted the money for your daughter's home, and the Swiss Male Chorus, and the checks I have named and referred to 3rd and Burnside property, and the 65th and Foster property, and the checks to Mr. Person and Mr. Masters, the balance would be for your own personal affairs?

A Yes, sir.''

As to exhibit 71, the following question by the court elicited the following answer by Mr. Schwarzenbach:

'' The Court: These checks from Exhibit 71, with the exception of a $50.00 check to Mr. Masters, all relate to your own personal affairs?

A Yes sir.

Mr. Masters: I think there were two checks there.''

It will be seen that the explanation sought by the trial judge in reopening the case was no more convincing from Schwarzenbach's oft-repeated assertion that the greater part of the money, represented by the assignments of the mortgages in suit, came from a safety deposit box maintained by himself and his wife, because they were afraid to trust their money to the safe-keeping of the banks.

Counsel for plaintiff argued that there is no showing that Solomon Miller had sufficient money to pay

for the assignments of the four mortgages which plaintiff seeks to foreclose. It does appear of record that Solomon Miller acquired the beneficial interest in some fifteen parcels of real estate besides the home property. It is true that he conveyed the home property to his daughter; and, not satisfied with making only one conveyance thereof, he later made a quitclaim deed thereof to plaintiff's daughter.

It is perplexing to attempt to follow or understand Miller's methods. Perjury and forgery attended some of his activity, selling wood alcohol for beverage purposes and stalling off the payment of his honest debts marked the course of others.

The system of using some friend in whose name he would execute a forged mortgage, then securing a bank record indicating an actual consideration by getting a third party to issue a check in the name of the purported mortgagee for a sum approximating the alleged consideration, and thereafter forging his friend's name on such check, in order to be able to cash it, is reflected in his transaction with Barnett Singer. If Barnett Singer had fallen for Miller's machinations and had insisted upon a foreclosure of the mortgage, a photostatic copy of which is known to this record as exhibit 35, would counsel for plaintiff insist in that proceeding that there was no showing that Miller had sufficient money to work such a racket?

The stub book of the Portland Hotel Company shows that for cash a check was issued in the name of Barnett Singer as payee for $810 at the request of Solomon Miller. The endorsement on that check is a forgery. Mr. Singer says that he refused to be a party to the scheme proposed by Miller that a fictitious mortgage be placed upon Miller's property in Singer's name to embarrass

Miller's creditors. We are not charged with the duty of telling the world how Miller obtained the money he used, or the property, the record title to which he sought to encumber with phoney, fictitious and feloniously framed liens and conveyances. Our duty is to give our best thought to the issue before us. Having done that, and having experienced the natural revulsion against the course confessedly taken by Miller, we are compelled to concur in the result announced by the trial judge.

The decree of the circuit court is affirmed.